**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AARON GOLLAND; TIMOTHY PARKER; JOSE SANTIAGO; and LANCE SMITH, individually and on behalf of all others similarly situated, | Case No.  1:24-cv-6270-GWG |
| Plaintiff, | Oral Argument Requested[1] |
| v. | |
| MAJOR LEAGUE BASEBALL ADVANCED MEDIA, L.P., | |
| Defendant. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO STRIKE AND DISMISS**

---

[1]    Oral argument is requested pursuant to §3.C of Judge Woods' Individual Rules of Practice and §2.F of Judge Gorenstein's Individual Practices.  Undersigned Counsel was admitted to practice law within the previous five years.

## <u>TABLE OF CONTENTS</u>

Introduction ................................................................................................................... 1

Background .................................................................................................................... 2

Video Privacy Protection Act ....................................................................................... 7

Applicable Legal Standard ............................................................................................ 8

Argument ...................................................................................................................... 8

   I.    Defendant's Motion to Strike Should Be Denied .............................................. 9

     A. Defendant Has Not Shown That Any Named Plaintiff Assented to the TOU ................. 9

       i.    Plaintiff Santiago's Sign-Up Process ....................................................... 11

       ii.   Plaintiff Parker's Sign-Up Process .......................................................... 13

       iii.  Plaintiff Smith's Sign-Up Process ........................................................... 16

       iv.  Plaintiffs Golland, Parker, and Santiago Did Not Have Actual or Inquiry Notice ... 18

     B. Defendant's TOU are Unconscionable .................................................................. 24

     C. Whether Plaintiffs' Class Allegations Should be Stricken is Premature ......................... 27

   II.   Plaintiffs Have Article III Standing ............................................................... 28

   III.  Plaintiffs Have Stated a Claim Under Rule 12(b)(6) ..................................... 32

     A.   Plaintiffs Have Alleged Actual Disclosure of Their Information to Meta ................... 32

     B.   Plaintiffs Have Adequately Alleged PII Under the VPPA ........................................ 36

CONCLUSION ........................................................................................................... 41

## **TABLE OF AUTHORITIES**

**Cases**

*Ambrose v. Bos. Globe Media Partners LLC*,
    No. CV 21-10810-RGS, 2022 WL 4329373 (D. Mass. Sept. 19, 2022). .................. 38, 41

*Applebaum v. Lyft, Inc.*,
    263 F. Supp. 3d 454 (S.D.N.Y. 2017).............................................................................. 22

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...................................................................................................... 8, 38

*Austin-Spearman v. AMC Network Ent. LLC*,
    98 F. Supp. 3d 662 (S.D.N.Y. 2015)................................................................................ 31

*Beagle v. Amazon.com, Inc.*,
    No. C24-0316JLR, 2024 WL 4028290 (W.D. Wash. Sept. 3, 2024). ............................ 35

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...................................................................................................... 8, 38

*Belozerov v. Gannett Co.*,
    646 F.Supp.3d 310 (D. Mass. 2022).............................................................................. 33

*Berkson v. Gogo LLC*,
    97 F. Supp. 3d 359 (E.D.N.Y. 2015). ............................................................................ 22

*Berman v. Freedom Fin. Network, LLC*,
    30 F.4th 849 (9th Cir. 2022).......................................................................................... 23

*Bernardino v. Barnes & Noble Booksellers, Inc.*,
    No. 17CV04570LAKKHP, 2017 WL 7309893 (S.D.N.Y. Nov. 20, 2017). .................... 26

*Brennan v. Bally Total Fitness*,
    198 F. Supp. 2d 377 (S.D.N.Y. 2002)........................................................................ 25, 26

*Brokamp v. James*,
    66 F.4th 374 (2d Cir. 2023) .......................................................................................... 29

*Colgate v. JUUL Labs, Inc.*,
    402 F. Supp. 3d 728 (N.D. Cal. 2019). .......................................................................... 23

*Collins v. Pearson Educ., Inc.*,
    721 F. Supp. 3d 274 (S.D.N.Y. 2024)...................................................................... passim

*Colon de Mejias v. Lamont*,
    963 F.3d 196 (2d Cir. 2020).............................................................................................. 9

*Cosmas v. Hassett*,
    886 F.2d 8 (2d Cir. 1989)................................................................................................ 41

*Cullen v. Shutterfly Lifetouch, LLC*,
    No. 20-CV-06040-BLF, 2021 WL 2000247 (N.D. Cal. May 19, 2021). ........................ 23

*Czarnionka v. Epoch Times Association, Inc.*,
    2022 WL 17069810 (S.D.N.Y. Nov. 17, 2022)............................................................... 34

*Daschbach v. Rocket Mortg., LLC*,
    No. 22-CV-346-JL, 2023 WL 2599955 (D.N.H. Mar. 22, 2023). ................................ 16

*Eichenberger v. ESPN, Inc.*,
    876 F.3d 979 (9th Cir. 2017). ........................................................................................ 39

*Eisen v. Venulum Ltd.*,
    244 F. Supp. 3d 324 (W.D.N.Y. 2017). ......................................................................... 24

*Ellis v. Cartoon Network, Inc.*,

803 F.3d 1251 (11th Cir. 2015). ........................................................................ 33, 37
*Ellis v. Cartoon Network, Inc.*,
   No. 14 Civ. 484 (TWT), 2014 WL 5023535 (N.D. Ga. Oct. 8, 2014). .......................... 33
*Feldman v. Star Trib. Media Co. LLC*,
   659 F. Supp. 3d 1006 (D. Minn. 2023). ....................................................................... 34
*Fteja v. Facebook, Inc.*,
   841 F. Supp. 2d 829 (S.D.N.Y. 2012) ........................................................................... 24
*Gaker v. Citizens Disability, LLC*,
   No. 20-CV-11031-AK, 2023 WL 1777460 (D. Mass. Feb. 6, 2023). ...................... 19, 20
*Ghanaat v. Numerade Labs, Inc.*,
   689 F. Supp. 3d 714 (N.D. Cal. 2023). ......................................................................... 38
*Gillman v. Chase Manhattan Bank, N.A.*,
   534 N.E.2d 824 (1988) ................................................................................................... 24
*Golden v. NBCUniversal Media, LLC*,
   688 F. Supp. 3d 150 (S.D.N.Y. Aug. 23, 2023) .................................................. 34, 35, 36
*Goldman v. Belden*,
   754 F.2d 1059 (2d Cir. 1985) ........................................................................................... 8
*Harris v. Pub. Broad. Serv.*,
   662 F.Supp.3d 1327 (N.D. Ga. 2023). .......................................................................... 33
*Hausburg v. McDonough*,
   No. 8:20-CV-2300-JSS, 2023 WL 2432322 (M.D. Fla. Mar. 9, 2023). ......................... 39
*Haymount Urgent Care PC v. GoFund Advance, LLC*,
   635 F. Supp. 3d 238 (S.D.N.Y. 2022) ........................................................................... 28
*Heerde v. Learfield Commc'ns, LLC*,
   No. 2:23-CV-04493-FLA (MAAX), 2024 WL 3573874 (C.D. Cal. July 19, 2024). ....... 38
*Hines v. Overstock.com, Inc.*,
   380 F. App'x 22 (2d Cir. 2010). ..................................................................................... 16
*Hines v. Overstock.com, Inc.*,
   668 F. Supp. 2d 362 (E.D.N.Y. 2009). .......................................................... 16, 17, 20, 23
*Holick v. Cellular Sales of New York, LLC*,
   802 F.3d 391 (2d Cir. 2015) ........................................................................................... 18
*In re Nickelodeon Consumer Priv. Litig.*,
   827 F.3d 262 (3d Cir. 2016) ......................................................................... 31, 36, 37, 38
*In re Vizio, Inc., Consumer Priv. Litig.*,
   238 F. Supp. 3d 1204 (C.D. Cal. 2017). ....................................................................... 37
*Jackson v. Fandom, Inc.*,
   No. 22-cv-04423-JST, 2023 WL 4670285 (N.D. Cal. July 20, 2023). ...................... 35, 36
*Kimes v. United States*,
   207 F.2d 60 (2d Cir. 1953) ............................................................................................. 10
*King v. Fox*,
   418 F.3d 121 (2d Cir. 2005) ........................................................................................... 25
*Lease Fin. Grp. LLC v. Indries*,
   49 Misc. 3d 1219(A), 29 N.Y.S.3d 847 (N.Y. Civ. Ct. 2015). ....................................... 27
*Lebakken v. WebMD, LLC*,
   640 F. Supp. 3d 1335 (N.D. Ga. 2022). .................................................................. 33, 39
*Li v. Georges Media Grp. LLC*,

No. CV 23-1117, 2023 WL 7280519 (E.D. La. Nov. 3, 2023). ......................................... 33

*Maldonado v. Nat'l Football League*,
No. 1:22-CV-02289 (ALC), 2023 WL 4580417 (S.D.N.Y. July 18, 2023). ..................... 24

*Mayfield v. Asta Funding, Inc.*,
95 F. Supp. 3d 685 (S.D.N.Y. 2015)......................................................................... 27, 28

*McLaughlin v. Advanced Commc'ns, Inc.*,
No. CV092311SJFETB, 2010 WL 11626961 (E.D.N.Y. Mar. 25, 2010). ....................... 25

*Metter v. Uber Technologies, Inc.*,
No. 16-cv-06652-RS, 2017 WL 1374579 (N.D. Cal. April 17, 2017). ...................... 15, 16

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017)....................................................................................... 9, 10

*Mollett v. Netflix, Inc.*,
795 F.3d 1062 (9th Cir. 2015). ....................................................................................... 8

*Motise v. Am. Online, Inc.*,
346 F. Supp. 2d 563 (S.D.N.Y. 2004)........................................................................... 17

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014). ........................................................................ 20, 22, 23

*Nicosia v. Amazon.com, Inc.*,
834 F.3d 220 (2d Cir. 2016)............................................................................. 21, 22, 23

*Offley v. Fashion Nova, LLC*,
671 F. Supp. 3d 60 (D. Mass. 2023). ............................................................................ 18

*Peiran Zheng v. Live Auctioneers LLC*,
No. 20-CV-9744 (JGK), 2021 WL 2043562 (S.D.N.Y. May 21, 2021). ........................ 25

*Plazza v. Airbnb, Inc.*,
289 F. Supp. 3d 537 (S.D.N.Y. 2018)............................................................................ 10

*Robinson v. Disney Online*,
152 F. Supp. 3d 176 (S.D.N.Y. 2015).............................................................. 39, 40, 41

*Rodriguez v. Sony Computer Ent. Am. LLC*,
No. C 11-4084 PJH, 2012 WL 12921066 (N.D. Cal. Apr. 20, 2012)............................. 36

*Roth v. Jennings*,
489 F.3d 499 (2d Cir. 2007)............................................................................................ 8

*Salazar v. Nat'l Basketball Ass'n*,
118 F.4th 533 (2d Cir. 2024)............................................................................. 8, 39, 40

*Sgouros v. TransUnion Corp.*,
817 F.3d 1029 (7th Cir. 2016). ..................................................................................... 20

*Sgouros v. TransUnion Corp.*,
No. 14 C 1850, 2015 WL 507584 (N.D. Ill. Feb. 5, 2015)...................................... 18, 20

*Smith v. Trinity Broad. of Texas, Inc.*,
No. 8:24-CV-01046-JVS-ADS, 2024 WL 4394557 (C.D. Cal. Sept. 27, 2024). ....... 38, 39

*Specht v. Netscape Communications Corp.*
306 F.3d 17 (2d Cir. 2002)..................................................................................... passim

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)....................................................................................................... 29

*Stark v. Patreon, Inc.*,
656 F. Supp. 3d 1018, 1025 (N.D. Cal. 2023). .............................................................. 38

*Starke v. SquareTrade, Inc.*,

913 F.3d 279 (2d Cir. 2019)..................................................................... 22, 23

*Starkey v. G Adventures, Inc.*,
    796 F.3d 193 (2d Cir. 2015)................................................................. 21

*State v. Wolowitz*,
    96 A.D.2d 47, 468 N.Y.S.2d 131 (1983)............................................... 24

*Sterk v. Redbox Automated Retail, LLC*,
    770 F.3d 618 (7th Cir. 2014)................................................................ 31

*Sullivan v. All Web Leads, Inc.*,
    No. 17-C-1307, 2017 WL 2378079 (N.D. Ill. June 1, 2017)............... 18, 19, 20

*Sullivan v. Study.com LLC*,
    No. 18-CV-1939 (JPO), 2019 WL 1299966 (S.D.N.Y. Mar. 21, 2019)......... 28

*IT Strategies Grp., Inc. v. Allday Consulting Grp., L.L.C.*,
    975 F. Supp. 2d 1267 (S.D. Fla. 2013)................................................. 15

*Treinish v. iFit Inc.*,
    No. CV 22-4687-DMG (SKX), 2023 WL 2230431 (C.D. Cal. Feb. 2, 2023)......... 23

*WCA Holdings III, LLC v. Panasonic Avionics Corp.*,
    704 F. Supp. 3d 473 (S.D.N.Y. 2023).................................................. 9

*Wilson v. Redbox Automated Retail, LLC*,
    448 F. Supp. 3d 873 (N.D. Ill. 2020).................................................... 23

*Wilson v. Triller, Inc.*,
    598 F. Supp. 3d 82 (S.D.N.Y. 2022)............................................. 39, 40, 41

*Yershov v. Gannett Satellite Info. Network, Inc.*,
    820 F.3d 482 (1st Cir. 2016)............................................................ 36, 37

*Zachman v. Hudson Valley Fed. Credit Union*,
    49 F.4th 95 (2d Cir. 2022)................................................................. 11

**Statutes**

Video Privacy Protection Act, 18 U.S.C. § 2710................................... passim

**Rules**

Federal Rule of Civil Procedure 8............................................................ 38
Federal Rules of Civil Procedure 12................................................ 4, 9, 32

**Constitutional Provisions**

U.S. Const. art. III.................................................................................. 29, 31

Aaron Golland, Timothy Parker, Jose Santiago, and Lance Smith (collectively, "Plaintiffs"), by and through undersigned counsel, submit their opposition to Defendant's Motion to Strike and Dismiss (ECF No. 36 (the "Motion" or "Mot.").)

## INTRODUCTION

Plaintiffs bring this class action against Defendant for violation of consumers' privacy rights as established by the Video Privacy Protection Act ("VPPA").

Defendant's customers pay for subscriptions to prerecorded videos and other audio-visual materials pertaining to Major League Baseball ("MLB") and its thirty MLB teams. Defendant also enables consumers to create an ongoing relationship with Defendant without purchasing a product but instead by exchanging detailed information about themselves and their devices in order to receive exclusive access to, *inter alia*, prerecorded video materials about the MLB, MLB games, MLB players, and its teams.

To increase its customer base and boost sales in the two years preceding the filing of this action, Defendant knowingly installed third-party tracking technologies on its websites that regularly disclosed consumers' personally identifiable information to third parties, including Meta Platforms, Inc. ("Meta") and Snap, Inc. ("Snapchat"), (collectively, "Tracking Technologies"). Plaintiffs allege that Defendant's disclosures of their (and numerous others') personally identifiable information violated the VPPA. *See* 18 U.S.C. § 2710(b)(1). The information disclosed by the Tracking Technologies constitutes "personally identifiable information" within the meaning of the VPPA because it specifically identifies each customer by name or cell phone number/email address and connects the name or cell phone number/email address to the specific title and corresponding URL of the prerecorded video content requested or obtained from Defendant's website. *See* 18 U.S.C. § 2710(a)(3) ("the term "personally identifiable information"

includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider").

Defendant has now moved to strike and dismiss the operative First Amended Class Action Complaint (the "Complaint"). The Motion is without merit. The Complaint's allegations demonstrate that none of the Plaintiffs manifested their assent to be bound by Defendant's Terms of Use ("TOU") – an essential element to contract formation, without which there is no basis to compel Plaintiffs to proceed on an individual basis – and that Plaintiffs plausibly state a claim under the VPPA. The Motion should be denied in its entirety.

## **BACKGROUND**

On August 20, 2024, Plaintiffs commenced this action alleging that Defendant violated the VPPA, 18 U.S.C. § 2710, by knowingly disclosing their and the other putative class members' personally identifiable information ("PII") without their consent. (*See* ECF No. 1.) On September 18, 2024, Defendant filed a pre-motion letter advising that it intended to move to dismiss the *Golland* Plaintiffs' complaint. (ECF No. 9.) On December 6, 2024, Plaintiff filed an amended complaint (ECF No. 13), which is now the operative complaint in the case. On December 19, 2024, Defendant filed a motion to strike the class action allegations and dismiss the Complaint contemporaneously with a memorandum of law in support of its motion. (ECF Nos. 35 & 36.) At the outset, Defendant's motion fails at a very basic point – not a single *Golland* Plaintiff assented to the Terms of Use ("TOU").

The Complaint alleges Defendant violated the VPPA with respect to two forms of disclosures of Plaintiffs' and the Class members' Personal Viewing Information through Tracking

Technologies.[2]  First, "Defendant operates the subscription-based website MLB.com," which itself uses Tracking Technologies to disclose consumers' Personal Viewing Information.  (*See* ECF No. 34, ¶¶ 2-3.)  Second, "Defendant operates a subscription-based streaming service accessible at MLB.tv [that] also contains prerecorded video content," which utilizes Tracking Technologies to disclose consumers' Personal Viewing Information.  (*Id.*)  The Tracking Technologies are snippets of programming code called the "Meta Pixel" and "Snapchat Pixel," which are published, developed, and offered for use by Meta and Snapchat, respectively.  (*Id.,* ¶ 3.)  Defendant chose to install these Tracking Technologies on its www.mlb.com website, affiliate MLB team websites, and the www.MLB.tv streaming service in violation of the VPPA.  *Id.*

Defendant argues that each of the *Golland* Plaintiffs assented to the TOU when they registered for accounts either with the www.MLB.com website or www.MLB.tv streaming service.  In support of this argument, Defendant relies on screenshots from a desktop version of its website.  *See* Mot. at 9 – 10.  But Defendant fails to establish contract formation for several threshold reasons, including because Plaintiffs Parker and Santiago used different methods to create their accounts other than a desktop computer, and because Plaintiff Smith signed up for the website in 2008, a time at which Defendant's website did not even disclose the existence of (much less ask him to agree to) the TOU when he enrolled in Defendant's services.  (*See* ECF No. 34, ¶ 18.)  ("Plaintiff Parker became a subscriber to Defendant's streaming service by registering and paying for a subscription ***via the mobile version*** of Defendant's website"); (*id.*, ¶ 25.) ("Plaintiff

---

[2]      The Complaint defines "Personal Viewing Information" as "records containing the personal information (including names and addresses) of each of its website and streaming service subscribers, along with detailed information revealing the titles and subject matter of the videos and other audiovisual materials requested or obtained by each of its subscribers."  (*See* ECF No. 34, ¶ 1.)  For purposes of this motion, that definition is used interchangeably with "Personally Identifiable Information" or "PII" as used in the VPPA.

Santiago became a subscriber to Defendant's streaming service by registering and paying for a subscription *via his Apple TV account*, including by providing his name, email address, payment information, and zip code."); (*id*., ¶ 18.) ("Plaintiff Smith *first subscribed to the MLB.com Website in April 2008*.").  And even assuming the remaining Plaintiffs did, in fact, use a desktop computer to join MLB.tv, Defendant's motion still fails because it fails to establish that Plaintiff Golland manifested assent to be bound by the TOU or that Plaintiff Smith's claim, which accrued prior to the earliest date on which he could potentially have agreed to the TOU, is somehow retroactively covered by the TOU in effect today.

Defendant also moves to dismiss this case under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1).  Defendant argues that the Complaint fails to state a claim because it does not allege that Defendant discloses any PII within the meaning of the VPPA.  *See, e.g.*, Mot. at 2-3.[3] Defendant also asserts that the Plaintiffs lack Article III standing.  *See, e.g.*, Mot. at 20.  Both arguments are equally unavailing because the Complaint sets forth the factual basis for each theory of Plaintiffs' claims, explaining the categories of personally identifiable information ("PII"), which Defendant has knowingly and intentionally disclosed through the use of Tracking Technologies, and explains how they suffered injuries in fact.

Concerning the Meta Pixel, the Complaint alleges that Plaintiffs each have Facebook accounts and that Defendant allowed third parties to connect the biographical information from their accounts to their personal video-watching history without their consent.  (*Id*., ¶¶ 4, 67-99.) The Complaint further alleges that Plaintiff and putative class members with Facebook accounts were assigned a unique, numerical Facebook ID ("FID") by Meta and that "FID" number is PII

---

[3] With respect to one of the *Henry* plaintiffs, Defendant argues that he fails to allege "consumer" status under the VPPA.  The *Golland* plaintiffs take no position on that issue in this brief, which addresses only Defendant's arguments directed toward the *Golland* plaintiffs.

because the numerical ID is indexed to an individual's Facebook account, which includes the individual's name, date of birth, and other personally identifying information. (*See id.*, ¶ 4.) ("A subscriber's FID is a unique sequence of numbers linked to the Meta profile belonging to that subscriber."); (*id.*, ¶ 94.) ("With only a person's FID and the subscription or video content name or URL that the person requested on Defendant's website—all of which Defendant knowingly provides to Meta —any ordinary person could learn the identity of the person to whom the FID corresponds and the specific video products or services that this person requested."). The Complaint then alleges that Defendant transmitted this FID to Meta, along with the titles and URLs of the videos and video materials its customers requested or obtained. (*See* ECF No. 34, ¶ 67) ("[W]hen subscriber to Defendant's website [www.MLB.com] ("Website subscriber") requests or obtains a specific video by clicking on the video on Defendant's website, the pixel technology that Defendant knowingly and intentionally installed on its website, transmits the subscriber's personally identifying information and detailed information concerning the specific interactions the Website subscriber takes on its website (including the subscriber's Personal Viewing Information revealing the specific videos that he or she requested) to Meta and Snapchat, without the Website subscriber's consent and in clear violation of the VPPA"); (*id.* at ¶ 68) ("[W]hen subscriber to Defendant's streaming service [www.MLB.tv] ("Streaming Service subscriber") purchases a subscription and later requests or obtains a specific video by clicking on the video on Defendant's website, the pixel technology that Defendant knowingly and intentionally installed on its website, transmits the subscriber's personally identifying information and detailed information concerning the specific interactions the Streaming Service subscriber takes on its website (including the subscriber's Personal Viewing Information revealing that a subscription was purchased and that specific videos were requested or obtained) to Meta and Snapchat, without the

Streaming Service subscriber's consent and in clear violation of the VPPA."); (*id*. at ¶ 81) ("Every transmission to Meta accomplished through the Meta Pixel includes at least two elements: (1) the website visitor's FID and (2) the URL of the webpage triggering the transmission."); (*id*. at ¶ 95) ("whenever Plaintiffs or another Website or Streaming Service subscriber requested a particular video (by clicking on it) on Defendant's website, Defendant disclosed to Meta that (inter alia) the specific video that was requested (including the URL where such video was accessed), along with the FID of the Website or Streaming Service subscriber who requested it (which, as discussed above, uniquely identifies the person).").

The Complaint also alleges Defendant disclosed PII to Snapchat when it disclosed Plaintiff Santiago's "email address [and phone number], the purchase of a streaming service subscription, and the particular videos that a subscriber requested or obtained while on the website or streaming service." (*See id*. at ¶¶ 5, 109.) Plaintiffs further allege that "during the purchase or registration process and each subsequent session on Defendant's Website or streaming service, Defendant uses – and has used at all times relevant hereto – the Snapchat Pixel to disclose to Snapchat the device platform, webpage URLs viewed, session ID, anonymous user ID, browser information, event codes, currency, and phone number of the person who made the purchase and the subscription title or specific title of video material that the person requested or obtained (as well as the URL where such video material is available)." (*Id*. at ¶ 106.) The Complaint then explains how the cell phone numbers and email addresses work in concert with other information disclosed, such as cookie values from subscribers' computers, to permit Snapchat to match off-Snapchat users across devices to their Snapchat accounts automatically. (*Id*. at ¶¶ 108-09.) The cookie values that Defendant has allowed and continues to allow Snapchat to harvest unbeknownst to subscribers is also personally identifying because that value is directly linked to subscribers' Snapchat accounts,

which are connected to and display their first and last name, email address, and cellphone number. (*Id*. at ¶¶ 5, 103.)

As shown below, Plaintiffs did not manifest assent to Defendant's TOU, Plaintiffs have standing to bring their claims, and Plaintiffs have sufficiently alleged their claims. Therefore, Defendant's Motion should be denied.

## **VIDEO PRIVACY PROTECTION ACT**

The United States Congress passed the VPPA in 1988. President Ronald Reagan signed the legislation into law that same year. The statute is designed to protect the privacy interests of consumers who request or obtain prerecorded video materials from providers of such services.

The VPPA defines the terms "consumer," "personally identifiable information," and "video tape service provider." The VPPA defines a "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). It defines "personally identifiable information" as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). It defines a "video tape service provider," in relevant part, as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials. . . ." 18 U.S.C. § 2710(a)(4).

The VPPA codifies a consumer's privacy right in the video content she or he requests or obtains. It provides that a "video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for the relief provided [below]." 18 U.S.C. § 2710(b). Several exceptions to violations of the law are also enumerated, none of which the Motion raises.

## APPLICABLE LEGAL STANDARD

When reviewing a motion to dismiss, the court must "accept the complaint's factual allegations, and all reasonable inferences that can be drawn from those allegations in the plaintiff's favor, as true." *Roth v. Jennings,* 489 F.3d 499, 501 (2d Cir. 2007). "That means the plaintiff's allegations must enable the court to reasonably infer that the defendant is liable for the alleged misconduct." *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 544 (2d Cir. 2024). The court's function "is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). To carry out that function, generally, a district court cannot consider evidence outside the pleadings to decide a motion to dismiss without converting it into a motion for summary judgment. *See id.*

To survive dismissal, a plaintiff's complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

A "plausible claim" under the VPPA requires a plaintiff to allege that (1) the defendant is a "video tape service provider," (2) the defendant disclosed "personally identifiable information concerning any customer" to "any person," (3) the disclosure was made knowingly, and (4) the disclosure was not authorized by the statutory exceptions. *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015). Plaintiffs have clearly and sufficiently alleged all four elements.

I.      **Defendant's Motion to Strike Should Be Denied**

Defendant argues the class allegations should be stricken under Rule 12(f) because (1) "Plaintiffs agreed to the class action waiver provision in [the] TOU" when they signed up for accounts; (2) the class action waiver is valid and enforceable under New York law because it is clearly and conspicuously placed in the TOU; and (3) striking the class allegations is appropriate when the class action waiver provision is separate and distinct from issues of class certification. (ECF No. 36, p. 13-20.)  Defendant's argument is meritless for three reasons.  First, Defendant fails to offer evidence sufficient for this Court to conclude that Plaintiffs, at the time of their individual signups, assented to be bound by the version of the TOU sought to be enforced in the Motion.  Second, the TOU as a whole is an unconscionable contract because it is one-sided in favor of Defendant as the drafter, and it is permeated with many other terms that are plainly unfair and burdensome to the consumer so as to render all terms therein void under New York law.  Third, striking the class allegations is premature at this stage because the Court's inquiry on this matter will mirror the class certification inquiry.

**A. Defendant Has Not Shown That Any Named Plaintiff Assented to the TOU**

Defendant has not met its burden to show that any Plaintiff manifested assent to the TOU. "State law determines whether an agreement is an enforceable contract[.]" *Colon de Mejias v. Lamont,* 963 F.3d 196, 203 (2d Cir. 2020).  "To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent, and intent to be bound." *WCA Holdings III, LLC v. Panasonic Avionics Corp.*, 704 F. Supp. 3d 473, 495 (S.D.N.Y. 2023).  Mutual assent is an essential element to contract formation, and without it, there is no basis to enforce any of the TOU provisions against Plaintiffs in this case.  *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) (explaining that online contracts of adhesion are only enforceable where the

"layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement.").

Web-based contracts come in three forms: clickwrap, browsewrap, or hybrid.  *See id*.  A "clickwrap" or "click-through" agreement requires that "users to click an 'I agree' box after being presented with a list of terms and conditions of use.  *See id*.  A "browsewrap" agreement "generally post[s] terms and conditions on a website via a hyperlink at the bottom of the screen." *See id*.  A "hybrid" agreement is present where a "user is required to affirmatively acknowledge the agreement before proceeding with use of the website." *Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 552 (S.D.N.Y. 2018).  The burden is on the moving party to demonstrate the existence of every element. *Kimes v. United States*, 207 F.2d 60, 64 (2d Cir. 1953).  Defendant's motion must be denied because it fails to demonstrate Plaintiffs' mutual assent for two key reasons.

**<u>First</u>**, Defendant has offered no evidence detailing when any of the *Golland* Plaintiffs joined www.MLB.com.  As Defendant's motion indicates, consumers must create an account on the main www.MLB.com site before a subscription can be purchased on the e-commerce platform known as www.MLB.tv.  (*See* ECF No. 36, p. 7-10.)  Defendant contends that Plaintiffs assented to the TOU through their registration to www.MLB.com. *See id*.  But Defendant simply presumes that each named Plaintiff created a www.MLB.com account at the same time they purchased their www.MLB.tv subscription. *See id*.  That is not the case.  Plaintiff Smith joined www.MLB.com in 2008. *See* Declaration of Lance Smith ("Smith Decl."), ¶ 2, attached hereto as **Exhibit A**; (*see also* ECF No. 34, ¶ 32.)  Defendant's Motion, however, only pictures or describes the www.MLB.com sign up flow as it existed in December 2024.  (ECF No. 36, p. 8-10.).  Thus, Defendant has offered no evidence regarding the sign up flow on www.MLB.com when Plaintiff Smith subscribed to the site in 2008, nor any theory as to how he might have manifested his assent

or become bound by the TOU at that time.  With respect to the other *Golland* Plaintiffs, Defendant offers no evidence regarding when they became subscribers to www.MLB.com.  As a result, Defendant has offered insufficient evidence to establish that the sign-up screenshots of www.MLB.com referenced in the Motion applied to the named Plaintiffs.  On this basis alone, the motion to strike must be denied.

A similar tactic was rejected by another judge from this Court in *Collins v. Pearson Educ., Inc.*, 721 F. Supp. 3d 274, 290 (S.D.N.Y. 2024).  That case was a VPPA matter wherein the defendant argued class allegations should be stricken based solely on a generic Pearson Subscription Agreement that offered no definitive evidence that the named plaintiff signed that agreement.  The Court in *Collins* explained the defendant "has not definitively shown that the class waiver within the arbitration provision clearly applies so as to preclude the participations of signatories in a class action . . . or even come forward with an arbitration agreement with, or purported class action waiver by, the named plaintiff."  *See Collins*, 721 F. Supp. 3d at 290; *see also Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 104 (2d Cir. 2022) (reversed and remanded because the defendant "did not submit evidence of how the Internet Banking Agreement was presented to users").  Consistent with *Collins* and *Zachman*, the motion to strike must be denied on the records presented here.

**<u>Second</u>**, Defendant has offered no evidence or argument regarding Plaintiff Santiago's sign-up from his Apple TV device, Plaintiff Parker's sign-up from the mobile version of the website, or Plaintiff Smith's sign-up from his desktop in 2008.  Defendant's Motion should be denied for this reason alone.

### i.  Plaintiff Santiago's Sign-Up Process

The Complaint alleges Plaintiff Santiago purchased a subscription to www.MLB.tv through his Apple TV device. (*See* ECF No. 34, ¶ 25.) To purchase a subscription to www.MLB.tv through an Apple TV device, a consumer must download the MLB application, and once downloaded, the initial screen provides three options: Create a Free Account, Browse Subscriptions, or Explore Free Content. *See* Declaration of Elliot Jackson ("Jackson Decl."), ¶ 1, attached hereto as **Exhibit B**. The consumer is then taken to a screen that offers subscription options. *See id.* After selecting a subscription option, the consumer is taken to another screen where the consumer can confirm their purchase from their Apple.com account. *See id.* Once the purchase is completed, the consumer is taken to a final screen where that consumer must create their MLB account to access the subscription. *See id.* On this final screen, after the purchase of a subscription is complete, is where language appears below the "Create Account" and "Log In" buttons that state, "By clicking Create Account, I accept and agree to the MLB.com Terms of Use and Privacy Policy. . . ." A copy of that screen is included below:





For the reasons provided in *Section iv* below, this screen does not provide actual or inquiry notice of the TOU sufficient for any consumer, including Plaintiff Santiago, to have manifested their assent to be bound.  Defendant's Motion should be denied as to Plaintiff Santiago on this basis alone.

### ii.   Plaintiff Parker's Sign-Up Process

Plaintiff Parker subscribed to www.MLB.tv through the mobile version of Defendant's website. *See* Declaration of Timothy Parker ("Parker Decl."), ¶ 2, attached hereto as **Exhibit C**; ECF No. 34, ¶ 25.)  Defendant's Motion acknowledges this fact but offers no argument or evidence regarding the mobile registration flow.  And the sign-up flow screenshots offered by Defendant are inconsistent with the mobile version that Plaintiff Parker experienced.  Below is a screenshot

depicting the www.MLB.com account creation screen as it would have appeared to Plaintiff Parker upon being loaded on his mobile device:

Jackson Decl., ¶ 2.  Only if Plaintiff Parker had scrolled down on this screen far past the "Register" button, prior to pressing the "Register" button, would the text below the button have appeared, as shown in the screenshot below:

14



Jackson Decl., ¶ 3.  But of course, neither Plaintiff Parker nor any other consumer presented with this screen would have had a reason to scroll down on it prior to completing the required fields and pressing the "Register" button.

Courts routinely refuse to find that a contract exists when a person must scroll to discover the submerged terms that purportedly bind them.  *See Specht v. Netscape Communications Corp.* 306 F.3d 17, 22-23 (2d. Cir. 2002) (terms "would have become visible to plaintiffs only if they had scrolled down to the next screen"); *Metter v. Uber Technologies, Inc.*, Case No. 16-cv-06652-RS, 2017 WL 1374579, at *4 (N.D. Cal. April 17, 2017) ("In effect, the keypad obstruction turns Uber's terms of service alert into something resembling an unenforceable 'browsewrap' agreement" because a registrant can purportedly agree to Uber's terms of service without knowing he is doing so.'"); *IT Strategies Grp., Inc. v. Allday Consulting Grp., L.L.C.*, 975 F. Supp. 2d 1267, 1280 (S.D. Fla. 2013) ("a reference to the existence of license terms on a submerged screen is not sufficient to place consumers on inquiry or constructive notice of those terms."); *Daschbach v.*

*Rocket Mortg., LLC*, No. 22-CV-346-JL, 2023 WL 2599955, at *8 (D.N.H. Mar. 22, 2023) (same conclusion); *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 367 (E.D.N.Y. 2009), *aff'd*, 380 F. App'x 22 (2d Cir. 2010). Here, Plaintiff Parker was never presented the TOU because the mobile version of Defendant's website does not present them in a reasonably conspicuous manner. *See Specht*, 306 F.3d at 22-23; *Metter*, 2017 WL 1374579, at *4. Defendant has presented no evidence that Parker ever encountered the TOU or the language below the "Register" button. Therefore, Defendant's motion fails as to Plaintiff Parker.

### iii.  Plaintiff Smith's Sign-Up Process

Plaintiff Smith subscribed to www.MLB.com in 2008 via Defendant's website. *See* Smith Decl., ¶ 2. Defendant has offered what appears to be the present-day sign-up flows for creating an account on www.MLB.com but submits no evidence showing what the page would have looked like in 2008 when Plaintiff Smith enrolled. (ECF No. 36, p. 8-10.). Below is a screenshot depicting the www.MLB.com account creation screen as it would have appeared to Plaintiff Smith in 2008:



Jackson Decl., ¶ 4. Because the TOU, as presented in 2008, is not anywhere near the "Login" button, is located at the absolute bottom of the webpage where scrolling would be necessary, is in the same font as surrounding text, and is not temporally connected to any action by the user, Defendant comes nowhere close to establishing that Plaintiff Smith manifested his assent to the TOU when he registered on this screen. *See Specht*, 306 F.3d at 31; *Hines*, 668 F. Supp. 2d at 367; *Motise v. Am. Online, Inc.*, 346 F. Supp. 2d 563, 564–65 & n.1 (S.D.N.Y. 2004) (no notice where the terms were available on a different part of website).[4]

---

[4]     Plaintiff Smith's claim accrued before he could possibly have agreed to any other version of the TOU. As shown in Smith's Declaration, he was a subscriber to the www.MLB.com website and the www.MLB.tv streaming service, and he requested or obtained prerecorded videos via both mediums between the beginning of the statutory period in this case, August 20, 2022, and Defendant's February 2024 update of the TOU to which it claims Plaintiff Smith is somehow bound. Defendant has offered no evidence that Plaintiff Smith was presented with, let alone agreed to, any other version of the TOU when he enrolled for his www.MLB.com account or www.MLB.tv subscription. Moreover, Defendant fails to even argue the TOU's class waiver should be applied retroactively, which it cannot. *See e.g., Holick v. Cellular Sales of New York,*

### iv. Plaintiffs Golland, Parker, and Santiago Did Not Have Actual or Inquiry Notice

Even assuming the three iterations of the registration page submitted by Defendant were in fact used by Plaintiffs to enroll in Defendant's service – and they were not for the reasons explained above – these versions of the page nonetheless failed to provide clear and conspicuous notice to Plaintiffs, and accordingly failed to manifest their assent to the TOU.

Beginning with Plaintiff Parker, courts routinely decline to hold website terms enforceable against visitors of web pages similar to Defendant's, where the disclosure statement (stating by clicking the button the visitor was agreeing to the terms) appeared in fine-print at the bottom of the webpage, below the button, and where nothing alerted users that further terms appeared below the button. For example, in *Sullivan v. All Web Leads, Inc.*, No. 17-C-1307, 2017 WL 2378079 (N.D. Ill. June 1, 2017), the court refused to find an agreement was formed where the plaintiff clicked a submission button on a website, where the disclosure statement concerning the terms appeared below the button, and where the website required the visitor to scroll down to even arrive at the submission button. The court explained:

> In this case, after Sullivan input his personal information, he clicked the "Submit" button immediately below the end of the health insurance quote form without scrolling down further to the bottom of the webpage to read All Web's Lilliputian consent language. In these circumstances, the Court thinks it "reasonable for users to assume that their click merely constituted their assent to [an] authorization" submitting their personal information further to getting a health insurance quote. *Sgouros*, 2015 WL 507584 at *5. . . . Given the website's silence on quotes proceeding by phone and failure to alert users that legal disclosures appear below the "Submit" box, the Court cannot, while drawing inferences in Sullivan's favor,

---

*LLC*, 802 F.3d 391, 398 (2d Cir. 2015) (refusing to compel a plaintiff to arbitration when the parties' contractual positions changed in a way that impacted arbitrability because an earlier contract between the parties did not contain an arbitration provision but a later contract contained an arbitration provision specifically related to certain claims); *Offley v. Fashion Nova, LLC*, 671 F. Supp. 3d 60, 67 (D. Mass. 2023) (refusing to give an arbitration provision and class action waiver found in online terms of use retroactive effect).

find that All Web's alleged consent mechanism gave Sullivan reasonable notice sufficient for an enforceable written "agreement[.]"

*Sullivan*, 2017 WL 2378079, at *8.  On similar facts, the court in *Gaker v. Citizens Disability, LLC*, No. 20-CV-11031-AK, 2023 WL 1777460 (D. Mass. Feb. 6, 2023), reached the same conclusion, explaining:

> The terms indicating that users who submitted their information on the Super-Sweepstakes website consented to be contacted by the site's marketing partners were printed in small font at the very bottom of the page. The Court accord[s] significant weight to the fact that the terms appeared below the "CONFIRM YOUR ENTRY" button, [] such that a user could—and in all likelihood, would—click on the button without ever reaching the portion of the page disclosing the terms. . . .
>
> [T]he mere presence of this disclosure on the webpage is insufficient to establish that the website reasonably notified the user of the terms. The totality of the page, including the size and color of the font and particularly the placement of the disclaimer at the bottom of the page, where a user who simply scrolled to the "CONFIRM YOUR ENTRY" button and clicked on it would never have seen it, strongly indicates an intent to distract a reasonable user from the language. Accordingly, Citizens has not established that it reasonably notified the user of the terms, nor that it gave the user the opportunity to review those terms prior to clicking "CONFIRM YOUR ENTRY."

*Gaker*, 2023 WL 1777460, at *7–8 (quotations and citations omitted).

Other binding decisions from this Circuit and other courts across the country are in accord. *See, e.g., Specht*, 306 F.3d at 17 (where an online service made available to consumers "at the immediate click of a button" was purportedly governed by license terms that appeared at the bottom of the screen, the court rejected the defendant's bid to enforce the license terms against a consumer who had clicked the button, explaining that "a submerged screen . . . is not sufficient to place consumers on inquiry or constructive notice of those terms," because "there is no reason to assume that viewers will scroll down to subsequent screens simply because screens are there"); *Sgouros v. TransUnion Corp.*, No. 14 C 1850, 2015 WL 507584, at *6-7 (N.D. Ill. Feb. 5, 2015) ("It is unreasonable to expect users to scroll down the Window when they are not aware of a

possibility of being bound by the terms in the Window."), *aff'd,* 817 F.3d 1029 (7th Cir. 2016); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014) ("Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement."); *Hines,* 668 F. Supp. 2d at 367 (finding no constructive notice because the plaintiff "was never advised of the Terms and Conditions and could not even see the link to them without scrolling down to the bottom of the screen—an action that was not required to effectuate her purchase. ").

In the present case, this Court should reach the same conclusion as the foregoing authorities. Because "there is no reason to assume that [visitors to Defendant's webpage on a mobile device] will scroll down to subsequent screens" below the "Register" button, *Specht*, 306 F.3d at 32, and because "a user could—and in all likelihood, would—click on the button without ever reaching the portion of the page disclosing the terms," *Gaker*, 2023 WL 1777460, at *7–8, the Defendant's mobile registration screen, like the screens at issue in *Specht, Gaker, Sullivan*, and *Sgouros*, failed to "place [Plaintiff or any other] consumers on inquiry or constructive notice of those terms." *See Specht*, 306 F.3d at 32. Accordingly, Plaintiff Parker's (or any other consumer's) click on the "Register" button on a mobile device failed to manifest his (or any other consumer's) assent to the class action waiver provision found buried in the TOU. *See id.* Therefore, Defendant's Motion should be denied as to Plaintiff Parker for this reason.

However, even if the language below the "Register" button on Defendant's mobile screen appeared on visitors' screens when the page loaded, such that scrolling past the button was not required for it to become visible, the statement below the button would still not constitute the "clear and conspicuous" notice required to obtain Plaintiff Parker, Plaintiff Golland or any visitors' assent to the TOU. Nor is the language that Plaintiff Santiago encountered sufficient to constitute the

"clear and conspicuous" notice because it is even less conspicuous.  The prime example is *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 237 (2d Cir. 2016), where Amazon.com's order page was similar to Defendant's three screens here, in stating that "by placing your order, you agree to Amazon.com's privacy notice and conditions of use," the Second Circuit found that, given the manner in which the statement appeared on the order page, the defendant had "failed to show that [the plaintiff] was on notice and agreed to mandatory arbitration as a matter of law" when she clicked a "Place your order" button.  The court explained its reasoning as follows:

> Near the top of the page, below the "Review your order" heading, the critical sentence appears in smaller font: "By placing your order, you agree to Amazon.com's privacy notice and conditions of use." Add. B. The phrases "privacy notice" and "conditions of use" appear in blue font, indicating that they are clickable links to separate webpages. The body of the page summarizes the user's purchase and delivery information. Among other things, users are shown their shipping address, billing address, and payment method, and given the option to edit that information or "try Amazon Locker." Users are also given the opportunity to change the delivery date, enter gift cards and promotional codes, and sign up for "FREE Two–Day Shipping with a free trial of Amazon Prime." The Amazon Prime promotion features the words "FREE Two–Day Shipping" four times in the center of the page, appearing in orange, green, and black fonts, and in white font against an orange banner. On the right side of the page appears a "Place your order" button above a box with the heading "Order Summary." The Order Summary box lists the cost of the items to be purchased, shipping and handling costs, total price before tax, estimated tax to be collected, purchase total, gift card amount, and order total. The words "Order total" appear in bold, red font. A large area in the center of the page has been redacted, but presumably features a picture of the product being purchased, its name, price, quantity, stock and seller information, and gifting options. Near the bottom of the page, there are a number of sentences in faint, black font directing users to links to other Amazon webpages for additional information, such as tax and seller information, customer assistance pages, and product return policies. At the very bottom of the page, links to the Conditions of Use and Privacy Policy appear again in blue, next to Amazon's copyright notice
>
> . . . .
>
> The message itself—"By placing your order, you agree to Amazon.com's ... conditions of use"—is not bold, capitalized, or conspicuous in light of the whole webpage. *Cf. Starkey v. G Adventures, Inc.*, 796 F.3d 193, 197 (2d Cir. 2015) (multiple bolded, capitalized headings alerting customers of terms and conditions was sufficiently reasonable notice). . . . There are numerous other links on the

21

webpage, in several different colors, fonts, and locations, which generally obscure the message. . . . Although it is impossible to say with certainty based on the record, there appear to be between fifteen and twenty-five links on the Order Page, and various text is displayed in at least four font sizes and six colors (blue, yellow, green, red, orange, and black), alongside multiple buttons and promotional advertisements. Further, the presence of customers' personal address, credit card information, shipping options, and purchase summary are sufficiently distracting so as to temper whatever effect the notification has.

*Nicosia*, 834 F.3d at 236–37 (citing *Nguyen*, 763 F.3d at 1179 ("Given the breadth of the range of technological savvy of online purchasers, consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound.")).

Another salient example is *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 293 (2d Cir. 2019), where the Court explained: "[t]he 'Terms & Conditions' hyperlink is some of the smallest text in the email and comes after ***several prompts unrelated to the enclosure of the contract***, ***including a "Need help?"*** hyperlink, a button for Starke to log in to his SquareTrade account, a hyperlink for Starke to submit the receipt for his CD player, the chart with details of the plan, and a banner urging Starke to review the Protection Plan on Amazon."  Other examples include *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359 (E.D.N.Y. 2015), where the defendant's website had language directly above a sign-in button that stated, by signing in the user agreed to the terms of use, the court held that the disclosure was nonetheless "insufficient to give adequate notice," *Berkson*, 97 F. Supp. 3d at 404, because the "hyperlink to the 'terms of use' was not in large font, all caps, or in bold," especially in contrast to the "user-friendly and obvious" "'SIGN IN' button" that appeared "in all caps." Id. Accordingly, the court concluded that this "sign-in contract of adhesion" was "not binding on [plaintiff]." *Id.; see also, e.g., Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 466-67 (S.D.N.Y. 2017) (though defendant required plaintiff to click a "box" next to hyperlink with the defendant's terms of service, the court concluded that plaintiff was not put "on inquiry notice of the terms of service," because the page featuring the clickable box featured a much larger "'Next'

bar at the bottom of the screen," which "dwarfed" the "I agree to Lyft's Terms of Service" language that is featured in "smallest font on the screen," such that "[a] reasonable consumer would not have understood that the light blue 'Terms of Service' hyperlinked to a contract for review").

Even assuming that Plaintiff Parker scrolled beyond the "Register" button and that Plaintiff Golland was presented the same terms as provided in Defendant's Motion, which did not occur, the language is inconspicuous because it is the smallest text on the screen, it is not underlined, and it appears well below other text that is bolded to draw a consumer's attention away. The language appearing below the "Log In" button for Plaintiff Santiago is even more inconspicuous because it is the same color and font as surrounding text, it appears at the bottom of the Television screen, it is the smallest text on the screen, it is not underlined, it is not in all capitalized letters, it does not otherwise provide any indication that the text is hyperlinked, and it does not permit a consumer to click the text to access the TOU. *See* Jackson Decl., ¶ 1. This Court should find that Plaintiffs Golland, Parker, and Santiago were not provided reasonably conspicuous notice for the reasons explained above and in *Specht*, *Nicosia*, *Nguyen*, *Starke*, and *Hines*.[5]

---

[5]    Such a conclusion would also be consistent with decisions from other jurisdictions. *See Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022) ("web designer[s] must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently 'set apart' from the surrounding text"); *Cullen v. Shutterfly Lifetouch, LLC*, No. 20-CV-06040-BLF, 2021 WL 2000247, at *8 (N.D. Cal. May 19, 2021) (finding defendant failed to carry its burden to prove assent to arbitration stating: "The subject language is in tiny print, that appears to be light gray in color, and there is no header or other indicator that would notify an individual of important contractual terms."); *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 766 (N.D. Cal. 2019) (hyperlinks insufficient where "[t]hey are not underlined [and] they are the same size as the sentence they are in."); *Wilson v. Redbox Automated Retail, LLC*, 448 F. Supp. 3d 873, 885 (N.D. Ill. 2020) ("Redbox's failure to add some additional distinguishing characteristic to the Terms of Use hyperlink is particularly glaring here"); *Treinish v. iFit Inc.*, No. CV 22-4687-DMG (SKX), 2023 WL 2230431, at *4 (C.D. Cal. Feb. 2, 2023) (rejecting the use of underlining alone to identify a hyperlink, including where, similar to here, the defendant's "hyperlinks are underscored, but in a smaller [font] that is the same color as the rest of the text[.]"), *appeal dismissed*, No. 23-55207, 2023 WL 5674594 (9th Cir. Aug. 4, 2023).

To the extent that Defendant relies on *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 835 (S.D.N.Y. 2012) and *Maldonado v. Nat'l Football League*, No. 1:22-CV-02289 (ALC), 2023 WL 4580417, at *3 (S.D.N.Y. July 18, 2023), those cases involved a different presentation of language informing consumers of the TOU.  For example, *Fteja* is distinguishable because the terms of use were hyperlinked with an underline, which is not present in the case before this Court under any of Defendant's three iterations.  Similarly, *Maldonado* is distinguishable because the TOU was underlined, hyperlinked, against a white background, and directly under the "Create An Account" or "Complete Order" buttons, which was not the case for Plaintiffs Golland and Parker.  While the language at issue for Plaintiff Santiago was directly beneath the button, the remaining reasons mentioned in *Maldonado* are not present.  Therefore, Defendant's Motion should be denied.

### B. Defendant's TOU are Unconscionable

Under New York law, "[a]n unconscionable contract has been defined as one which is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms."  *Gillman v. Chase Manhattan Bank, N.A.*, 534 N.E.2d 824, 828 (1988).  Generally, unconscionability "requires a showing that the contract was both procedurally and substantively unconscionable when made—*i.e.,* some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party."  *See id*.  "The procedural element of unconscionability concerns the contract formation process and the alleged lack of meaningful choice; the substantive element looks to the content of the contract, per se." *State v. Wolowitz*, 96 A.D.2d 47, 468 N.Y.S.2d 131, 145 (1983).  New York law does however allow for "a finding of unconscionability, in exceptional cases, even where there was no procedural unconscionability." *Eisen v. Venulum Ltd.*, 244 F. Supp. 3d 324, 342 (W.D.N.Y. 2017).  A "court must make its

unconscionability determination after a "full exploration of all the facts and circumstances" surrounding the agreement, including the intent of the parties and the value of the attorney's services in proportion to the fees charged." *King v. Fox*, 418 F.3d 121, 135 (2d Cir. 2005).

Here, Plaintiffs can demonstrate both procedural and substantive unconscionability.

**Procedural unconscionability:** As discussed above, Defendant used deceptive tactics when it did not present the TOU to Plaintiffs Parker and Smith at all; Defendant used high-pressure tactics to coerce Plaintiff Santiago to accept the TOU as inconspicuously presented when he was required to complete his purchase well before he even learned that Defendant had a TOU; and Defendant used deceptive tactics when it inconspicuously presented the TOU to Plaintiff Golland, if at all. Courts in this Circuit have routinely found procedural unconscionability where a plaintiff never received the agreement that purports to bind them and where the plaintiff has a short time to read and digest the agreement that purports to bind them. *See Brennan v. Bally Total Fitness*, 198 F. Supp. 2d 377, 384 (S.D.N.Y. 2002) (procedural unconscionability found where plaintiff only had fifteen minutes to review agreement); *McLaughlin v. Advanced Commc'ns, Inc.*, No. CV092311SJFETB, 2010 WL 11626961, at *3 (E.D.N.Y. Mar. 25, 2010) ("Plaintiff was not provided an opportunity to take the Arbitration Agreement home and review it or to consult an attorney prior to signing it.").

To the extent that Defendant argues placement of the class action provision within the TOU renders it enforceable under New York law, this argument is equally unavailing because the cases cited did not involve class action waivers or directly interpret such waivers. *See e.g., Peiran Zheng v. Live Auctioneers LLC*, No. 20-CV-9744 (JGK), 2021 WL 2043562, at *6 (S.D.N.Y. May 21, 2021) (motion to compel arbitration under the FAA – no class action waiver mentioned);

*Bernardino v. Barnes & Noble Booksellers, Inc.*, No. 17CV04570LAKKHP, 2017 WL 7309893, at *13 (S.D.N.Y. Nov. 20, 2017) (indirect reference only).

     **Substantive unconscionability:** Defendant's TOU and the class action waiver therein are substantively unconscionable because (1) the TOU affords Defendant the unilateral ability to modify the contract at any time, and (2) the class action waiver is incongruous with itself and the remaining provisions within the TOU. *Brennan v. Bally Total Fitness*, demonstrates how Defendant's TOU is substantively unconscionable because, in that case, another judge on this Court found an agreement to arbitrate substantively unconscionable because "(1) its terms allow Bally to unilaterally modify the contract at any time, thus binding employees to a contract they may never have seen; and (2) the EDRP denied Brennan the right to proceed in court on her pending sexual harassment claim against the company." *See* 198 F. Supp. 2d at 384. Here, Defendant's TOU clearly states, "MLB in its sole discretion may amend this Agreement," which mirrors the language in *Brennan* and any consumer would be bound by an agreement that they have not seen.

     As further evidence of unconscionability, the class action waiver is grossly incongruous with itself because, at one point, it states, "You and MLB agree to waive any right to bring or to participate in such an action in arbitration or in court to the fullest extent permitted by applicable law. " The preceding sentence defines "Action" to include "A Class, Collective, Consolidated, Private Attorney General, or Representative Action." Thus, by these two sentences alone, an MLB subscriber can neither bring nor participate in any of these actions. However, Defendant added a final sentence to the provision, which further raises the incongruous nature of the entire provision by stating that "Notwithstanding the foregoing, the parties retain the right to participate in a class-wide settlement." There is no way for a MLB consumer to participate in a class-wide settlement,

which inherently involves opting in or out and filing objections, without violating the prefatory provisions of the class action waiver.

Lastly, the class action waiver, when read in line with the remaining TOU, "is so outrageous as to warrant holding it unenforceable." *Lease Fin. Grp. LLC v. Indries*, 49 Misc. 3d 1219(A), 29 N.Y.S.3d 847 (N.Y. Civ. Ct. 2015) explains the outrageousness present in this case. *Lease* involved a forum selection clause that was found substantively unconscionable because it required disputes between the parties be heard in a court located in the County and State of New York, required the non-drafter to travel two thousand seven hundred (2,700) miles from California to New York City to defend himself in a case worth roughly $2,600.00. Here, Plaintiffs can demonstrate each *Lease* consideration is met based on the TOU and class action waiver. Defendant's TOU contains (1) a class action waiver that purports to only allow individual actions, (2) a forum selection clause that lays venue in the "federal and state courts in New York County, New York," which is over 700 miles away from the furthest named Plaintiff, and (3) an Arbitration provision that specifically excludes VPPA claims ($2,500). Having established the procedural and substantive unconscionability of the TOU, Defendant's Motion should be denied.

### C. Whether Plaintiffs' Class Allegations Should be Stricken is Premature

It is well established that "motions to strike are generally looked upon with disfavor." *Mayfield v. Asta Funding, Inc.*, 95 F. Supp. 3d 685, 696 (S.D.N.Y. 2015). "In the context of motions to strike class allegations, a Rule 12(f) motion will generally be deemed premature because it requires a reviewing court to preemptively terminate the class aspects of litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class

certification." *Sullivan v. Study.com LLC*, No. 18-CV-1939 (JPO), 2019 WL 1299966, at *2 (S.D.N.Y. Mar. 21, 2019) (internal quotation marks omitted).

*Study.com* is particularly instructive to the present case because Study.com moved to strike class allegations from the complaint because "it will be impossible for [the plaintiff] to certify the putative class because the proposed class would include paying members of Study.com, and that these class members would have each entered into arbitration agreements that included class-action waivers when signing up for membership with Study.com. *See* 2019 WL 1299966, at *6. Defendant's motion makes this very same argument, "[b]ecause Plaintiffs are bound by the valid class-action waiver in their contract with MLBAM, the Court should strike their class allegations." (ECF No. 36, p. 17.) The critical flaw to Defendant's argument is that Defendant failed to produce any evidence that every named Plaintiff is bound by the TOU, as discussed and shown above. Therefore, Defendant's argument is nothing more than a "speculative possibility" that "does not warrant striking all of Sullivan's class allegations at this stage of the litigation." *See Study.com*, 2019 WL 1299966, at *6. Just as the Court in *Study.com* rejected this argument, this Court should as well. *See also Mayfield*, 95 F. Supp. 3d at 696 ("Defendants' continued failure to produce contracts between any plaintiff and AT & T, and Defendants' admission that all contracts during the relevant period have been destroyed . . . it is certainly possible that Defendants will be unable to prove that Plaintiffs—even those who do not deny having accounts with AT & T—waived their class action rights."); *Haymount Urgent Care PC v. GoFund Advance, LLC*, 635 F. Supp. 3d 238, 245 (S.D.N.Y. 2022) (declining to strike). Therefore, Defendant's Motion should be denied.

## II.    Plaintiffs Have Article III Standing

Defendant argues that "because Plaintiffs' complaints lack any factual allegations showing that a disclosure occurred, Plaintiffs have not shown that they suffered any cognizable injury under

the VPPA, further precluding their claims." (*See* ECF No. 36, p. 25.) Defendant further specifies, albeit in a footnote, that the Article III standing argument made here is different because it challenges whether a disclosure was actually made (injury-in-fact). (*See id.*) Defendant's argument fails because a disclosure has occurred for the reasons discussed *infra*, and because that disclosure is apparent, Defendant has relied on no case to support its position.

A plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "To satisfy the first requirement, a plaintiff must plead an injury that is 'concrete and particularized and . . . actual or imminent, not conjectural or hypothetical.'" *Brokamp v. James*, 66 F.4th 374, 386 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 1095 (2024) (citation omitted).

Here, the Complaint alleges Defendant disclosed each named Plaintiff's Personal Viewing Information without their consent through Defendant's installation of the Tracking Technologies. (*See* ECF No. 34, ¶ 12.) ("On multiple occasions during the two years preceding the filing of this action, Plaintiff Golland used his subscription to Defendant's streaming service to request and obtain prerecorded videos from Defendant. On each such occasion, Defendant disclosed to Meta Plaintiff Golland's FID coupled with the specific title of the video he requested and obtained and the URL where he requested access to and obtained the video, among other information concerning Plaintiff Golland and the device on which he used to request and obtain the video."); (*id.* at ¶ 19.) ("On multiple occasions during the two years preceding the filing of this action, Plaintiff Parker used his subscription to Defendant's streaming service to request and obtain prerecorded videos from Defendant. On each such occasion, Defendant disclosed to Meta Plaintiff Parker's FID coupled with the specific title of the video he requested and obtained and the URL where he

29

requested access to and obtained the video, among other information concerning Plaintiff Parker and the device on which he used to request and obtain the video."); (*id*. at ¶ 28.) ("On each such occasion, Defendant disclosed to Meta Plaintiff Santiago's FID coupled with the specific title of the video he requested and obtained and the URL where he requested access to and obtained the video, among other information concerning Plaintiff Santiago and the device on which he used to request and obtain the video. Also, on each such occasion, Defendant disclosed to Snapchat Plaintiff Santiago's persistent account identifier and email address coupled with the specific title of the video he requested and obtained and the URL where he requested access to and obtained the video, among other information concerning Plaintiff Santiago and the device on which he used to request and obtain the video."); (*id*. at ¶ 34.) ("On multiple occasions during the two years preceding the filing of this action, Plaintiff Smith used his subscription to Defendant's website to request and obtain prerecorded videos from Defendant. On each such occasion, Defendant disclosed to Meta Plaintiff Smith's FID coupled with the specific title of the video he requested or obtained and the URL where he requested access to and obtained the video, among other information concerning Plaintiff Smith and the device on which he used to request and obtain the video"); (*id*. at ¶ 35.) ("On multiple occasions during the two years preceding the filing of this action, Plaintiff Smith used his subscription to Defendant's MLB.tv streaming service to request and obtain prerecorded videos from Defendant. On each such occasion, Defendant disclosed to Meta Plaintiff Smith's FID coupled with the specific title of the video he requested or obtained and the URL where he requested access to and obtained the video, among other information concerning Plaintiff Smith and the device on which he used to request and obtain the video.").

These allegations are sufficient to establish each Plaintiff suffered an injury-in-fact. Specifically, courts across this nation and in this Circuit have plainly rejected Defendant's

argument, such as in *Collins*, 721 F. Supp. 3d at 280.  Judge Engelmayer from this Court made the

following observations in *Collins*:

> The Supreme Court has held that "disclosure of private information" is an intangible harm traditionally recognized as actionable in American courts. *TransUnion*, 594 U.S. at 425, 141 S.Ct. 2190 (citing, *inter alia, Davis v. FEC*, 554 U.S. 724, 733, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008)). And, specific to this statute, courts in this Circuit have held that "because the VPPA creates a specific right to relief for disclosures made in violation of the statute, a plaintiff asserting claims under the VPPA need only assert [his] information was wrongfully disclosed to have asserted an 'injury in fact' supporting Article III standing." *Austin-Spearman v. AMC Network Ent. LLC*, 98 F. Supp. 3d 662, 668 (S.D.N.Y. 2015). The Complaint here clears that threshold. *See, e.g., Carter*, 670 F. Supp. 3d at 90 (complaint alleged concrete injury under VPPA where plaintiff's video-watching and personal information was allegedly disclosed to Facebook); *Martin v. Meredith Corp.*, 657 F. Supp. 3d 277, 283 (S.D.N.Y. 2023) (complaint alleged concrete injury under VPPA where plaintiff's personal information was allegedly disclosed to third party).
>
> The specificity that Pearson demands—the titles of the videos Collins viewed and the dates he viewed them—is unnecessary given the well-pled allegation that Pearson, as a matter of course, shared such titles and dates with third parties, via the Pixel installed on its website that routinely transferred to Facebook a user's Facebook ID and their video-viewing history.  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Def. of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (cleaned up).  The Complaint's allegation here of an overarching business practice necessarily picks up the specific facts necessary to establish the claim.

Given the overwhelming weight of authority cited by the *Collins* court, this Court should

adopt that reasoning and summarily reject Defendant's Article III standing arguments.  *See also*

*Austin-Spearman v. AMC Network Ent. LLC*, 98 F. Supp. 3d 662, 666 (S.D.N.Y. 2015)

(recognizing that "every court to have addressed this question has reached the same conclusion,

affirming that the VPPA establishes a privacy right sufficient to confer standing through its

deprivation."); *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 274 (3d Cir. 2016) (same);

*Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 623 (7th Cir. 2014) ("By alleging that

Redbox disclosed their personal information in violation of the [Video Privacy Protection Act],

[plaintiffs] have met their burden of demonstrating that they suffered an injury in fact that success in this suit would redress.").  Because the Complaint clearly alleges an actual disclosure of the named Plaintiffs PII as discussed *supra* and *infra*, Defendant's Motion should be denied.

### III.    Plaintiffs Have Stated a Claim Under Rule 12(b)(6)

Defendant argues Plaintiffs have failed to state plausible VPPA claims under Rule 12(b)(6) because (1) "their complaints lack any factual allegations showing that MLBAM disclosed their data" and instead "plead a general theory about how MLB.tv, MLB.com, and routine software tools work," (2) Plaintiff Santiago's "Snapchat-based disclosure allegations are too speculative to come close to Rule 12(b)(6)'s plausibility requirement[,]" (3) "Plaintiffs do not plausibly allege that they had public social-media profiles allowing an ordinary person to identify them," and (4) Plaintiff Santiago's Snapchat-based claim fails because he does not explain how his email address or  Snapchat identifiers can identify him to an ordinary person.  (*See* ECF No. 36, p. 21-32.) Defendants arguments are simply without merit as explained below.

### A.  Plaintiffs Have Alleged Actual Disclosure of Their Information to Meta

The VPPA defines "personally identifiable information" as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(1).

In this case, the Complaint alleges that Defendant disclosed to Meta the Facebook IDs of its Website and Streaming Service Subscribers and that its disclosure of those Facebook IDs was paired with the URLs of the webpages where consumers purchased a subscription to, or requested or obtained prerecorded videos from Defendant.  (*See* ECF No. 34, ¶¶ 67-99.)  As alleged in the Complaint, the URLs identify and contain the names of the videos requested or obtained by consumers.  (*Id.*, ¶¶ 81, 94-95.)  Facebook IDs are personally identifying to Meta and any other

person because they are indexed to an individual's Meta account, which, as the Complaint alleges, includes the individual's first and last name and "other personally identifying information about the subscriber as well." (*Id.*, ¶ 4.) The other personally identifying information generally includes information provided at the time one signs up for their Facebook account, such as "first and last name, birth date, gender, and phone number or email." (*Id.*, ¶ 69.) In any person's hands, Facebook IDs are personally identifying because anyone in possession of a Facebook ID can use it to identify a person's Facebook account, which displays their name and other identifying information. (*See id.* at ¶¶ 4, 94.)

Courts have consistently held that disclosures of Facebook IDs to Meta in combination with the URLs or names of videos requested or obtained by consumers constitute actionable disclosures under the VPPA. *See, e.g.*, *Harris v. Pub. Broad. Serv.*, 662 F.Supp.3d 1327, 1334 (N.D. Ga. 2023) (holding that the "bundling of the [Facebook ID] from the c_user cookie with the URLs of the videos Plaintiff watched" satisfies the disclosure element); *Belozerov v. Gannett Co.*, 646 F.Supp.3d 310, 314 (D. Mass. 2022) (finding a Facebook ID meets the definition of personally identifiable information) (collecting cases); *Lebakken v. WebMD, LLC*, 640 F. Supp. 3d 1335, 1342 (N.D. Ga. 2022) ("[Plaintiff] adequately alleged that [defendant] disclosed her Facebook ID and email address in connection with her video viewing information to Facebook and that the disclosure of such information constituted a disclosure of PII."); *Ellis v. Cartoon Network, Inc.*, No. 14 Civ. 484 (TWT), 2014 WL 5023535, at *3 (N.D. Ga. Oct. 8, 2014) (same), *aff'd on other grounds*, 803 F.3d 1251 (11th Cir. 2015). In *Li v. Georges Media Grp. LLC*, No. CV 23-1117, 2023 WL 7280519, at *4 (E.D. La. Nov. 3, 2023), the court denied a motion to dismiss stating that "many courts have found that FIDs constitute PII under the statute. At the very least, Meta can easily 'link' the FID to a specific user." In *Czarnionka v. Epoch Times Association, Inc.*, 2022

WL 17069810, at *3 (S.D.N.Y. Nov. 17, 2022), the court denied a motion to dismiss finding that "[t]he FID itself represents a particular individual." The Southern District of New York recently summarized the jurisprudential landscape on this subject, writing that "Courts have *uniformly* held Facebook IDs to constitute PII under the VPPA, particularly where—as here—the plaintiff alleges that her Facebook ID was disclosed alongside the viewed video's URL and name." *Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 159 (S.D.N.Y. Aug. 23, 2023) (emphasis added) (collecting cases).

Here, the Complaint's allegations are almost identical to those in *Collins*. *See* 721 F. Supp. 3d at 280 (denying a motion to dismiss VPPA complaint explaining that "courts in this District have uniformly held that disclosure of a 'Facebook ID [ ] would readily permit an ordinary person to identify a specific individual's video-watching behavior' and that the plaintiff's complaint adequately alleged the defendant's 'transmission of his Facebook ID discloses his identity as required by the VPPA.'"). Plaintiffs also allege that a Facebook ID "identifies a person more precisely than a name, as numerous persons may share the same name, but each person's Facebook profile (and associated FID) uniquely identifies one and only one person." (*See* ECF No. 34, ¶ 4.) It further alleges that in order to create a Meta account (and obtain a corresponding Facebook ID), an individual needs to provide Meta their name, birthday, name, and phone number or email address. (*Id.*, ¶ 69.) Finally, the Complaint ties those allegations to the named Plaintiffs by alleging that they each had a "Meta account, a Meta profile, and an FID associated with such profile," when they purchased an MLB.tv subscription or registered for an MLB.com account and requested or obtained prerecorded video materials from Defendant. (*Id.*, ¶¶ 13, 20, 26, 36.); *see also Feldman v. Star Trib. Media Co. LLC*, 659 F. Supp. 3d 1006, 1020–21 (D. Minn. 2023) (finding that a plaintiff plausibly alleged his personally identifiable information was disclosed via

the Meta Pixel when he alleged that his Facebook profile contained his name, "making it feasible to identify [him] by reference to this information.").

These allegations are more than sufficient to clear the hurdle from merely possible to plausible, as was the case in *Collins*. *See* 721 F. Supp. 3d at 280 (collecting SDNY cases to support the outcome). Defendant's motion even recites the very allegations – "on multiple occasions at unspecified times, MLB "disclosed to Meta [Plaintiff's] FID coupled with the specific title of the" unidentified video that the plaintiff "requested" or "obtained" and an unidentified "URL where he requested access to and obtained the video." (*Id.* ¶¶ 12, 19, 28, 34.)" that courts in this Circuit, District, and across the country have found are sufficient to plead actual disclosure. *See Collins*, 721 F. Supp. 3d at 280; *Golden*, 688 F. Supp. 3d at 159 (emphasis added) (collecting cases); *see also Jackson v. Fandom, Inc.*, No. 22-cv-04423-JST, 2023 WL 4670285, at *4 (N.D. Cal. July 20, 2023).

Setting aside Defendant's inapplicable hypotheticals, (*see* ECF No. 36 at 24-25.), Defendant relies on one case outside this Circuit, *Beagle v. Amazon.com, Inc.*, No. C24-0316JLR, 2024 WL 4028290 (W.D. Wash. Sept. 3, 2024), to support its contention that Plaintiffs have failed to plead actual disclosure of their data. (ECF No. 36 at 24.) *Beagle* is patently distinguishable because it involved Amazon.com's alleged amalgamation of data that plaintiffs provided to Amazon Services, which was alleged to have been shared with Amazon.com and affiliates based simply on statements made in the Privacy Policy and nothing more. *See* 2024 WL 4028290, at *1-3. At even a cursory level review, *Beagle* neither involved pixel technology nor did it involve an actual separate disclosure of information by one party to another. *See id.* at *1. Courts are in accord that a plaintiff cannot state a VPPA claim when the only evidence of their claim is the company's privacy policy without more. *See e.g., Rodriguez v. Sony Computer Ent. Am. LLC*, No.

C 11-4084 PJH, 2012 WL 12921066, at *1 (N.D. Cal. Apr. 20, 2012).  The *Golland* Plaintiffs' allegations are based on third party Tracking Technologies that, by their installation and configuration alone, disclosed the named Plaintiffs and putative class members' identifiers and more to third parties at Defendant's direction.  *See e.g., Collins*, 721 F. Supp. 3d at 280; *Golden*, 688 F. Supp. 3d at 159 (emphasis added) (collecting cases); *Jackson*, 2023 WL 4670285, at *4. Because the Complaint alleges an actual disclosure of the named Plaintiffs FIDs to Meta and Plaintiff Santiago's email address/cellphone to Snapchat, Defendant's Motion should be denied.

### B.  Plaintiffs Have Adequately Alleged PII Under the VPPA

In hail-Mary fashion, Defendant lastly argues that Plaintiffs' VPPA claims fail because they do not allege their social media profiles are public as a minority of courts have required plaintiffs to satisfy the "ordinary person test" articulated in *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 290 (3d Cir. 2016).  (*See* ECF No. 36 at 27.)  Defendant further argues that Plaintiff Santiago's Snapchat-based claim fails for a similar reason and because that claim fails to allege PII.  (*See* ECF No. 36 at 30-31.)  The ordinary person test is not the law of this Circuit, and rightfully so, because it contravenes the plain language and statutory history of the VPPA.  Even more so, the Second Circuit is unlikely to adopt the ordinary person test.  For the reasons that follow, Defendant's motion should be denied.

As explained above, "personally identifiable information" is defined under the VPPA as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(1).  In *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482 (1st Cir. 2016), the First Circuit (with retired Justice Souter sitting by designation) articulated a test for "PII" which better comports with the legislative intent and statutory text of the VPPA.  It held that the term "personally identifiable information"

encompasses "information reasonably and foreseeably likely to reveal which . . . videos [a person] has obtained." *Id.* (emphasis added).  It noted that the phrase "personally identifiable information" is "awkward and unclear" and that its statutory definition "adds little clarity beyond training our focus on the question [of] whether the information identifies the person who obtained the video." *Id.* Nevertheless, it wrote, "the language reasonably conveys the point that [personally identifiable information] is not limited to information that explicitly names a person," and it gave a succinct and persuasive reading of the term's broader scope through textual analysis, legislative history, and colloquial sports analogies.  *Id.*  Many courts have endorsed the *Yershov* analysis as more consistent with statutory construction.  *See e.g.*, *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1226 (C.D. Cal. 2017) ("The Court finds *Yershov* to be a more persuasive interpretation of the VPPA than *In re Nickelodeon* . . . [because] *Yershov* focused foremost on the text of the statute, while In re Nickelodeon turned quickly to "the more controversial realm of legislative history."); *Ellis*, 803 F.3d at 1256; *Yershov*, 820 F.3d at 486 ("Nevertheless, the language reasonably conveys the point that PII is not limited to information that explicitly names a person. Had Congress intended such a narrow and simple construction, it would have had no reason to fashion the more abstract formulation contained in the statute.").

Regardless of which test applies, Plaintiffs have alleged the contents of a Meta account and alleged that each of them had accounts, which transforms the FID into PII under any standard. (*See* ECF No. 34, ¶¶ 4, 13, 20, 26, 36, 69.)  These allegations alone are sufficient to distinguish this case from any case cited by Defendant.  Defendant's Motion argues that "plaintiffs fail to allege that their FIDs "le[d] to a Facebook page that discloses personal and identifying information" about them."  (*See* ECF No. 36 at 30.)  The opposite is true.  The Complaint specifically alleges that a "subscriber's Meta profile, in turn, publicly identifies the subscriber by

name (and contains other personally identifying information about the subscriber as well)" including the information a person must provide to create a Meta account such as "his or her first and last name, birthdate, gender, and phone number or email."  (*See* ECF No. 34, ¶¶ 4, 69.) Because the Complaint alleges the contents of a Meta/Facebook account, Defendant's reliance on *Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 720 (N.D. Cal. 2023) and *Heerde v. Learfield Commc'ns, LLC*, No. 2:23-CV-04493-FLA (MAAX), 2024 WL 3573874, at *4 (C.D. Cal. July 19, 2024) is plainly inapposite.  In both *Ghanaat* and *Heerde*, the plaintiffs failed to allege personal information existed on their Facebook page that could be used to readily identify them.  This pleading deficiency is not however present in the case before this Court.

Instead, Defendant relies on *Smith v. Trinity Broad. of Texas, Inc.*, No. 8:24-CV-01046-JVS-ADS, 2024 WL 4394557, at *3 (C.D. Cal. Sept. 27, 2024), to argue that a VPPA plaintiff "must establish that (1) her Facebook profile is publicly accessible and (2) includes sufficient identifying information."  *Smith,* however, relies on *In re Nickelodeon*'s ordinary person test for this proposition, which is not binding precedent in this Circuit.  In fact, to require that a plaintiff plead the public or private nature of their Facebook account contravenes the short plain statement pleading standard articulated by Rule 8 and the Supreme Court,[6] and it raises a factual dispute that need not be addressed at the pleading stage.  *See e.g., Ambrose v. Bos. Globe Media Partners LLC*, No. CV 21-10810-RGS, 2022 WL 4329373, at *2 (D. Mass. Sept. 19, 2022).  Because the Complaint clearly alleges the FID is PII, Defendant's Motion should be denied.

Concerning the Snapchat Pixel, the Complaint specifically alleges that three pieces of information disclosed by Defendant to Snapchat constitute PII: (1) email addresses, (*see* ECF No.

---

[6]    *See e.g., Stark v. Patreon, Inc.*, 656 F. Supp. 3d 1018, 1025 (N.D. Cal. 2023) (finding that "a plaintiff's burden at the pleading stage is relatively light[,]" citing Rule 8, and relating that discussion to *Twombly* and *Iqbal*).

34, ¶¶ 5, 109.); (2) phone numbers, (*see id.*, ¶¶ 106, 109.); and (3) cookie data that automatically identifies Snapchat profile information such as a user's email or phone number. (*See id.*, ¶ 109.) Several courts have held that email addresses or phone numbers are PII. *See Lebakken*, 640 F. Supp. 3d at 1342 (finding that disclosure of inter alia an email address is PII); *Smith*, 2024 WL 4394557, at *2 ("Other PII that enables an ordinary person to identify an individual may include an individual's name and telephone number, an individual's name and birthday, GPS coordinates of a particular device, a Facebook link, or an email address."); *Hausburg v. McDonough*, No. 8:20-CV-2300-JSS, 2023 WL 2432322, at *1 (M.D. Fla. Mar. 9, 2023) (finding email addresses were personally identifiable information such that good cause exists to seal filings in a federal employment action); *see generally Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 981 (9th Cir. 2017) (declaring that "an email address may very well readily enable an 'ordinary person' to identify an individual"); *Salazar*, 118 F.4th at 549 n.10 (recognizing that "[s]ome of the legislative history suggests that Congress intentionally used that word to help keep the 'personally identifiable information' term broad . . . [thus] there may be breathing room in the statute to explore what exactly is "personally identifiable information.").

To argue otherwise, Defendant overstates *Wilson v. Triller, Inc.*, 598 F. Supp. 3d 82, 91 (S.D.N.Y. 2022) and *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 179 (S.D.N.Y. 2015), as standing for the proposition that Plaintiff "Santiago's Snapchat allegations fail to show a disclosure of PII." (*See* ECF No. 36 at 30.). At the outset, there are at least three distinguishable features about the *Triller* allegations when measured against the allegations in this case. First, the *Triller* plaintiff alleged that a pairing was required to connect the disclosed data points with a particular individual. *See id.* at 92 ("Rather, as alleged, in order to make this association, the third party must "pair" the UID with information from a user's Triller profile page, which may or may not contain

various personal information about the user, such as any information included in the 'About Me' page or a URL associated with a photograph of the user."). Plaintiff Santiago alleges no such hypothetical pairing is required in order to identify the user's Snapchat profile or account and, thus, the user's identity because Snapchat, through Defendant's installation of the Snapchat Pixel, automatically matches the www.MLB.com or www.MLB.tv user with his or her Snapchat profile when Defendant's site is visited by accessing the user's stored computer cookie data.

Second, *Triller* has been abrogated to the extent that it even discusses "personally identifiable information" as defined by the VPPA. Specifically, in *Triller*, the court found that as "a matter of statutory interpretation, it appears that the narrower definition [of PII] is the correct one." *See Triller*, 598 F. Supp. 3d at 92. However, in *Salazar*, 118 F.4th at 549 n.10, the Second Circuit rejected the notion that the VPPA's definition of "personally identifiable information" is narrow when it engaged in its own statutory construction of the VPPA's provisions. Instead, it found that Congress intended for the term "personally identifiable information" to be broad. Thus, the only vestige remaining from *Triller* is that the plaintiff, in that case, failed to plead PII from anonymized data, which is not the case before this Court. Plaintiff Santiago's email address, phone number, or cookie data is not anonymized. Therefore, *Triller* is inapposite and should be completely disregarded. Third, *Triller* did not involve the disclosure of email addresses or phone numbers alongside video URLs where prerecorded video materials were requested or obtained, distinguishing that case from the present case.

Defendant's reliance on *Robinson* is equally unavailing for at least two reasons. First, the *Robinson* court recognized that "PII is information which itself identifies a particular person as having accessed specific video materials." *See* 152 F. Supp. 3d at 182. Because an email address or cellular phone number, like names and home addresses, identify a specific person, the rule

articulated in *Robinson* favors Plaintiffs as opposed to the Defendant.  Second, the *Robinson* court recognized that the case before it involved anonymized device identifiers, which is patently distinguishable from the direct cookie data that is present in the case before this Court.  Indeed, the Complaint alleges the "Snapchat first-party cookie used to identify users is the "sc_at" cookie, which stores a unique variable (combination of letters, numbers, and characters) that Snapchat assigns to each Snapchat user on their website."  (*See* ECF No. 34, ¶ 108.)  The "sc_at" cookie is similar to the FID discussed above because the value stored in this Snapchat cookie automatically tracks back to the user's Snapchat account and it is automatically intercepted by Defendant's use of the Snapchat Pixel, allowing Defendant to create its own first-party cookie that has the exact same value as the "sc_at" cookie uniquely known and assigned by Snapchat.  (*See id.*, ¶ 109-09.)  Given this specific information, the "sc_at" cookie data is not anonymized as was the case in *Robinson* and *Triller*.  Therefore, neither case is applicable.  This Court should deny Defendant's Motion.[7]

## **CONCLUSION**

For the reasons stated herein, Plaintiffs respectfully request that the Court deny Defendant's motion to dismiss in its entirety and deny Defendant's request to strike the class allegations asserted in the Complaint.

---

[7]    Defendant cites myriad external sources that are neither relied on nor referenced in the Complaint to argue that this Court can consider other documents and avoid converting the motion to dismiss into a motion for summary judgment.  Such an argument is meritless.  *See Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) ("[L]imited quotation does not constitute incorporation by reference.").  Moreover, it appears Defendant tries to pull in extrinsic documents to support factual issues, i.e. contents of a Snapchat profile and who can access Snapchats, which should be reserved for a later stage in this litigation.  *See Ambrose*, 2022 WL 4329373, at *2.

Dated: February 8, 2025

Respectfully submitted,

**HEDIN LLP**

/s/ *Elliot O. Jackson*
ELLIOT O. JACKSON
NEW YORK REG. NO. 6076798
1395 BRICKELL AVE., SUITE 610
MIAMI, FLORIDA 33131-3302
TELEPHONE:    (305) 357-2107
FACSIMILE:    (305) 200-8801
EJACKSON@HEDINLLP.COM

*Attorney for Plaintiffs and the Putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will provide electronic notification of such filing to all parties of record.

/s/ *Elliot O. Jackson*